# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF SOUTH CAROLINA

# COLUMBIA DIVISION

| | |
|---|---|
| Palmetto Hallmark Operating LLC, d/b/a Hallmark Healthcare Center; Palmetto Lake City Operating LLC, d/b/a Lake City Scranton Healthcare Center; Palmetto Prince George Operating LLC, d/b/a Prince George Healthcare Center; Palmetto Jolly Acres Operating, LLC, d/b/a Jolly Acres Healthcare Center; Palmetto Oakbrook Operating LLC, d/b/a Oakbrook Health & Rehabilitation Center; Palmetto St. George Operating LLC, d/b/a St. George Healthcare Center; Palmetto Springdale Operating LLC, d/b/a Springdale Healthcare Center; and, Palmetto Faith Operating LLC, d/b/a Faith Healthcare Center;<br><br>       Plaintiffs,<br><br>v.<br><br>Norris Cochran, Acting Secretary of the United States Department of Health and Human Services; and Patrick Conway, M.D., Acting Administrator for the Centers for Medicare and Medicaid Services;<br><br>       Defendants. | **Case No.**   3:17-326-JFA<br><br><br>**VERIFIED COMPLAINT FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |

Plaintiffs are the operators of eight skilled nursing facilities in the State of South Carolina ("Plaintiffs") and provide care to 742 residents, many of whom suffer from multiple co-morbidities. Plaintiffs hereby bring this action against Norris Cochran, as Acting Secretary of the United States Department of Health and Human Services ("HHS"), and Patrick Conway, M.D., Acting Administrator for the Centers for Medicare and Medicaid Services ("CMS"), and state as follows:

## INTRODUCTION

1.      By way of correspondence dated August 15, 2016, Wisconsin Physician Services Insurance Corporation ("WPS"), the agent for defendant Acting Administrator for the CMS, provided notice of the revocation of the Medicare provider number for the Plaintiffs' eight skilled nursing facilities located in South Carolina, effective August 24, 2015.  The notice claimed that the facilities were currently owned by an individual, Avi Klein, who had plead guilty to a felony, and thus the Plaintiffs were in violation of 42 C.F.R. § 424.535(a)(3).  42 C.F.R. § 424.535(a)(3) provides CMS discretion to revoke a Medicare provider's billing privileges.  The revocation of Plaintiffs' billing privileges was not based in any way upon the quality of care provided at the Plaintiffs' facilities.

2.      On September 13, 2016, Plaintiffs each filed an Expedited Request for Reconsideration of Medicare Billing Privileges and submitted the declaration of Mr. Kenneth Tabler, who had reviewed the books and records for each of the Plaintiff facilities.  Mr. Tabler testified that Mr. Klein's management responsibilities and ownership interest were relinquished and transferred to a third party effective August 15, 2015, prior to the entry of Mr. Klein's guilty plea, and a year prior to the revocation notice..  The relinquishment was memorialized in a Membership Interest Assignment and Assumption Agreement, which was subsequently amended to correct a scrivener's error.

3.      Plaintiffs asserted that because Mr. Klein transferred his ownership interests and ended his officer and director responsibilities in the facilities on August 15, 2015, a year prior to CMS' revocation of the Plaintiffs' Medicare provider numbers, CMS had no basis, as a matter of law, to utilize its discretion to revoke the Plaintiffs' Medicare provider billing privileges pursuant to  42 C.F.R. § 424.535(a)(3).

2

4. On September 13, 2016, Plaintiffs each filed timely Expedited Requests for Reconsideration of Medicare Billing Privileges to the CMS Provider Enrollment and Oversight Group ("PEOG"). Plaintiffs included documentary evidence that Mr. Klein had relinquished all ownership rights in the facilities prior to WPS' issuance of the revocation notice and stated that they were willing to provide additional information to CMS, if needed.

5. On November 17, 2016, the CMS PEOG denied the Plaintiffs' requests to be reinstated, finding that the revocation was warranted under 24 C.F.R. § 424.535(a)(3). The PEOG determined that the Plaintiffs' assertions regarding Mr. Klein's transfer of ownership could not be validated because the Plaintiffs had failed to provide certain ownership records to validate the change of ownership, despite the Plaintiffs' offer to provide further documentation.

6. On December 5, 2016, the Plaintiffs initiated an appeal with the Departmental Appeals Board ("DAB"), Civil Remedies Division. Pursuant to the Order Establishing Schedule for Expedited Case Development, the parties filed cross motions for summary judgment on January 13, 2017. On January 31, 2017 the Administrative Law Judge ("ALJ") issued a decision finding it was undisputed that "Avi Klein's indirect ownership of 25% of Petitioners and his role as manager of Palmetto Health were divested and terminated effective August 15, 2015," before he was convicted of a felony. The ALJ nonetheless granted summary judgment to CMS solely because the final documentation "took some time to finalize and was not signed until some months after the effective date." He therefore held that CMS properly revoked Plaintiffs' Medicare enrollment billing privileges pursuant to 42 C.F.R. § 424.535(a)(3), effective August 24, 2015 (the "ALJ Decision").

7.    The Decision was accompanied by a DAB transmittal informing the parties that a request for review of the ALJ decision could be filed within 60 days after receipt of the ALJ Decision.  The Plaintiffs intend to request a review of the ALJ Decision.

8.    The Plaintiffs have continued to care for all of their residents, including Medicare beneficiaries without Medicare reimbursement throughout this stage of the administrative appeals process.  The Plaintiffs have also continued to provide care to their residents at the facilities based on the facts which demonstrate that Mr. Klein's management responsibilities and ownership interests were  relinquished effective August 15, 2015.

9.    Defendants' refusal to reinstate the Plaintiffs' Medicare provider billing privileges, and the failure of CMS to pay for the services provided by the Plaintiffs to their residents with Medicare coverage since August 15, 2016, seriously compromises the ability of the Plaintiffs to continue to provide care to all of the residents at the facilities.

10.    The continued cessation of Medicare reimbursement will result in the closure of Plaintiffs' skilled nursing facilities.  In addition, a risk exists that CMS may directed the South Carolina State Medicaid agency to cut off all reimbursement, based on the ALJ Decision, at which point the Plaintiff facilities will have no option but to close immediately.  Plaintiffs cannot continue to care for over 130 Medicare patients without being reimbursed and will be forced to close their facilities before the administrative process can be completed for this reason alone.

11.    Closure of the Plaintiff facilities will especially place residents' lives at risk. Although all 742 residents would need to be transferred, there are not enough skilled nursing facility beds in the entire State of South Carolina to accommodate these residents.  Most residents will need to be transferred far away from their family and friends not only to different

parts of the state, but to other states. Such a large scale transfer of skilled nursing residents risks mass incidents of "transfer trauma" and the potential loss of life.

12.     By this civil action, the Plaintiffs pray the Court issue a temporary restraining order and an injunction preventing the Defendants from revoking Plaintiffs' Medicare and Medicaid billing privileges until Plaintiffs' challenges to Defendants' revocation have been exhausted, including the request for review to the DAB of the Defendant HHS or from directing the South Carolina State Medicaid agency from discontinuing Medicaid payments.

13.     Plaintiffs further pray for the issuance of a temporary restraining order and injunction to restore the Plaintiffs' Medicare billing privileges through the pendency of the DAB proceedings, so the facilities can maintain the status quo, continue to provide quality care to their residents and to avoid the crisis that will undoubtedly occur if all 742 residents must be transferred.

14.     Injunctive relief is appropriate because Plaintiffs have a high likelihood of success on the merits (CMS had no authority to revoke the Medicare billing privileges pursuant to 42 C.F.R. § 424.535(a)(3)); Plaintiffs will suffer irreparable harm in the form of closing their facilities; and the balance of harms weigh in favor of the requested relief (temporary restoration of Medicare billing privileges through the pendency of the DAB proceedings versus the health and wellbeing of 742 sick, vulnerable, and elderly residents); and an injunction is in the public interest.

## PARTIES

15.     Plaintiff Palmetto Hallmark Operating LLC, d/b/a Hallmark Healthcare Center, is a Delaware limited liability company, and the operator of the skilled nursing facility that

provides services to Medicare residents, located at 255 Midland Parkway, Summerville, South Carolina 29485-8104.

16.    Plaintiff Palmetto Lake City Operating LLC, d/b/a Lake City Scranton Healthcare Center, is a Delaware limited liability company, and the operator of the skilled nursing facility that provides services to Medicare residents, located at 1940 Boyd Road, Scranton, South Carolina 29591-5835.

17.    Plaintiff Palmetto Prince George Operating LLC, d/b/a Prince George Healthcare Center, is a Delaware limited liability company, and the operator of the skilled nursing facility that provides services to Medicare residents, located at 901 Maple Street, Georgetown, South Carolina 29440-4377.

18.    Plaintiff Palmetto Jolly Acres Operating, LLC, d/b/a Jolly Acres Healthcare Center, is a Delaware limited liability company, and the operator of the skilled nursing facility that provides services to Medicare residents, located at 1180 Wolfe Trail, Orangeburg, South Carolina 29115-7339.

19.    Plaintiff Palmetto Oakbrook Operating LLC, d/b/a Oakbrook Health & Rehabilitation Center, is a Delaware limited liability company, and the operator of the skilled nursing facility that provides services to Medicare residents, located at 920 Travelers Boulevard, Summerville, South Carolina 29485-8213.

20.    Plaintiff Palmetto St. George Operating LLC, d/b/a St. George Healthcare Center, is a Delaware limited liability company, and the operator of the skilled nursing facility that provides services to Medicare residents, located at 905 Dukes Street, Saint George, South Carolina 29477-2059.

21.     Plaintiff Palmetto Springdale Operating LLC, d/b/a Springdale Healthcare Center, is a Delaware limited liability company, and the operator of the skilled nursing facility that provides services to Medicare residents, located at 146 Battleship Road, Camden, South Carolina 29020-2060.

22.     Plaintiff Palmetto Faith Operating LLC, d/b/a Faith Healthcare Center, is a Delaware limited liability company, and the operator of the skilled nursing facility that provides services to Medicare residents, located at 617 West Marion Street, Florence, South Carolina 29501-2421.

23.     Defendant Norris Cochran, is the Acting Secretary of HHS, the federal agency of the United States of America charged with overseeing the operation of the Medicare program. Acting Secretary Cochran is sued in his official capacity only.

24.     Defendant Patrick Conway, M.D., is the Acting Administrator for CMS and is sued in his official capacity only.

## JURISDICTION AND VENUE

25.     This action arises under the Social Security Act, 42 U.S.C. § 301 et seq., implicating both the Medicare Act, 42 U.S.C. § 1395 et seq. and the Medicaid Act, 42 U.S.C. § 1396 et seq.[1], as well as the Fifth and Fourteenth Amendments to the United States Constitution.

26.     This Court has jurisdiction over this action pursuant to 42 U.S.C. § 405(g), 28 U.S.C. § 1331, 28 U.S.C. § 1361, and pursuant to the Court's general equity powers.

27.     Venue is proper in this District under 28 U.S.C. § 1391(b) and (e).

---

[1] Under applicable law, once Plaintiffs have completely exhausted their administrative appeal rights through the DAB, Medicare will be required to terminate Plaintiffs' billing privileges.  See  42 C.F.R. § 455.416(C); 42 C.F.R. § 455.101.

## FACTS

### Background

28.     In 2006, Avi Klein, through an entity called ASK Holdings, LLC, acquired an indirect, 25% ownership interest in Palmetto Health Care LLC, the owner of all of the Plaintiffs' skilled nursing facilities. Mr. Klein also served as an officer and director of all of the facilities. Mr. Klein's ownership interest and officer and director responsibilities were reported to CMS on the 855A enrollment forms for each of the Plaintiffs.

29.     On June 24, 2014, Mr. Klein was indicted by the U.S. Attorney's Office for the Western District of Virginia as a result of alleged unlawful conduct that Mr. Klein had engaged in relating to the operations of a Virginia skilled nursing facility. The Virginia facility was not owned or operated by Palmetto Health or any of its subsidiaries, nor any of the Plaintiffs.

30.     As a result of the pending criminal case against Mr. Klein, it was determined that Mr. Klein should no longer have any continuing relationship with Palmetto Health or the Plaintiffs. At that time and prior to adjudication of his guilty plea, Mr. Klein assigned ASK Holdings, LLC's 25% ownership interest in Palmetto Health to an entity owned by the other two owners of Palmetto Health LLC, effective August 15, 2015.

31.     Mr. Klein also resigned from his officer and director positions with Palmetto Health the Plaintiffs, effective August 15, 2015 and neither he nor ASK Holdings, LLC have held any direct or indirect ownership interests or held any director, officer, or manager position in any of the Plaintiffs since August 15, 2015.

32.     On August 24, 2015, in the Virginia criminal proceeding, Mr. Klein pled guilty to racketeering in violation of 18 U.S.C. §§ 1962(d) and 1961. Mr. Klein was later excluded from

8

Medicare, Medicaid or other federal health care programs, effective August 24, 2015, by the U.S. Department of Health & Human Services, Office of Inspector General.

33.     On August 15, 2016, WPS, acting on behalf of CMS, issued notices to each of the Plaintiffs revoking their Medicare provider billing privileges.  The notices stated the Plaintiffs' Medicare privileges were being revoked, in pertinent part, pursuant to 42 C.F.R. § 424.535(a)(3), citing Avi Klein's ownership interest in the Plaintiffs.

34.     On September 13, 2016, Melissa Warlow, Senior Vice President of FAS (the administrative services provider of the Plaintiffs), submitted official CMS-855A enrollment applications to WPS on behalf of each of the Plaintiffs, in order to update and correct the Plaintiffs' ownership information and remove Avi Klein as an owner and/or officer or director with the Plaintiffs from CMS' enrollment records.

35.     CMS rejected the Plaintiffs' CMS-855A enrollment applications.

**Plaintiffs Were Unlawfully Denied Reinstatement of**

**Medicare Billing Privileges through the Administrative Process**

36.     Pursuant to CMS' rules and regulations, to pursue administrative remedies when a party is aggrieved by a decision of WPS, such as those described herein, a party must file a request for reconsideration with the CMS' PEOG.

37.     On September 13, 2016, each of the Plaintiffs timely filed requests for reconsideration with the PEOG, requesting reinstatement of their Medicare privileges.  The Requests for Reconsideration included documentary evidence that Avi Klein had relinquished all ownership rights in the facilities prior to both Mr. Klein's plea adjudication and WPS' issuance of the revocation notice.

38.     The documentary evidence included a sworn Declaration of Kenneth Tabler, President of Palmetto Health and the Plaintiff facilities, that he had reviewed the facilities' books and records and determined that Avi Klein had relinquished his ownership interest and officer and director functions at Palmetto Health and at all of the Plaintiffs' facilities as of August 15, 2015.  He also explained that a Membership Interest Assignment and Assumption Agreement memorialized the transaction.

39.     The documentary evidence further included a letter from Melissa Warlow, the Senior Vice President of FAS (the administrative services provider of the facilities), confirming that Avi Klein had no affiliation with the facilities in any way since August 15, 2015.

40.     A September 2016 updated CMS-855A Form enrollment application was also included which (i) added Kenneth Tabler as an Officer of the facilities, effective August 15, 2015, (ii) deleted ASK Holdings, LLC as an owner, effective August 15, 2015, (iii) deleted Avi Klein as an owner effective August 15, 2015, and (iv) updated and corrected the facilities' historical and current ownership structure.  Kenneth Tabler signed the 855A form, in his capacity as President of the Plaintiff facilities, in which he certified that he understood that supplying false information was punishable by criminal, civil, or administrative penalties including, but not limited to, the denial or revocation of Medicare billing privileges, and/or the imposition of fines, civil damages, and/or imprisonment.

41.     Based on the information in the updated 855A, CMS had specific information confirming the direct and indirect owners of the facilities, as well as Avi Klein's removal from the facilities.

42.     On November 17, 2016, the PEOG denied the Plaintiffs' requests to be reinstated in the Medicare program, finding that the revocations were warranted under 42 C.F.R. §

424.535(a)(3) (having an owner convicted of a felony). In the PEOG Denial, CMS found that the Plaintiffs' assertions regarding Avi Klein's transfer of ownership interest could not be "validated" because the Plaintiffs failed to provide ownership records or other similar documentation, such as the Membership Interest Assignment and Assumption Agreement.

43. On November 21, 2016, Plaintiffs' counsel Arent Fox contacted the PEOG to discuss the basis for the PEOG's reconsideration denial and offered to send the Membership Interest Assignment and Assumption Agreement immediately to the PEOG so the PEOG could review the document and reexamine its decision. The PEOG indicated it would not review any additional documents submitted by the facilities regarding Mr. Klein's transfer of ownership or reexamine its decision.

44. Pursuant to HHS rules and regulations, to pursue administrative remedies when a party is aggrieved by a decision of PEOG, a party must file a notice of appeal pursuant to 42 C.F.R. § 498.40, et seq., with the DAB. An appeal to the DAB is the last available administrative remedy.

45. On December 5, 2016, each of the Plaintiffs timely filed an appeal to the DAB, requesting consolidation of the appeals, an expedited hearing, and reinstatement of their Medicare privileges.

46. In accordance with a December 21, 2016 Ruling and Order Establishing Schedule for Expedited Case Development, the Plaintiff facilities and CMS filed cross motions for summary judgment on January 13, 2017. On January 31, 2017 the ALJ issued the ALJ Decision. The Decision was accompanied by a DAB transmittal informing the parties that a request for review of the ALJ decision could be filed within 60 days after receipt of the ALJ decision.

47.     The Plaintiffs intend to request a review of the ALJ decision, but as of the time of filing this Petition, the Plaintiffs cannot predict when the DAB would issue a decision on Plaintiffs' request for review.  Plaintiffs are informed and believe based upon similar requests that the Plaintiffs' facilities will all be closed before the DAB process is completed and the Plaintiffs have an emergency need for the Court to intervene as further discussed below.

48.     Under these circumstances Plaintiffs are excused from the requirement to exhaust their administrative remedies because the time for completion of the pending administrative remedy will be too long and the administrative appeal process will not afford an adequate remedy at law.  Plaintiffs will have no effective administrative remedy before suffering irreparable harm if this action is delayed pending the results of the request for review of the ALJ Decision to the DAB.

## The Imminent Closure of the Facilities and Transfer of 742 Residents

49.     Absent action by this Court, the Plaintiffs will be forced to close their eight facilities, and hundreds of frail and elderly Medicare residents will be displaced, in most cases, at great risk of physical and emotional harm.

50.     There is a census for Skilled Nursing Facilities ("SNF") in the State of South Carolina, including Plaintiffs' facilities.  The census tracks residency at SNFs which care for the Medicare residents, of the type of residents at Plaintiffs' facilities.

51.     Plaintiffs' eight facilities provide services to a broad range of residents with a multitude of health issues. The typical resident of these facilities is elderly, frail, and with co-morbidities based generally on multi-system failure.  Residents often require assistance with activities of daily living including eating, drinking, bathing, medication administration, and ambulation.  They also require skilled nursing services and rehabilitation therapy.

52.     Following CMS' August 2016 revocation of Plaintiffs' Medicare provider numbers, the facilities have received only approximately $40,000 in reimbursement from the Medicare Program.  The lack of Medicare reimbursement is having an extreme, negative effect on the Plaintiffs' cash flow.  Although it is the intention of the Plaintiffs to continue to provide quality care to their residents, Plaintiffs cannot continue to operate given these financial circumstances.

53.     If the Plaintiffs were to cease operations at their eight facilities, roughly 1,055 employees will be laid off, and worse, all 742 residents will need to be relocated to different nursing facilities.

54.     Plaintiffs are informed and believe from the current publicly available data, as determined by a resident's payer source, that the number of available beds in South Carolina for the Medicare and private pay residents of the Plaintiffs' SNF facilities is only 330 beds, leaving no nursing facility space, anywhere in the State, for the other 412 residents.  Even as to those 330 nursing facility beds available within the State, many of the residents would need to be moved many miles away and far from their families.  Additionally, the typical private pay and Medicare census of the Plaintiffs' eight facilities is not more than 30 percent of the total number of residents who would need to be relocated from the Plaintiffs' eight facilities.

55.     Based upon Plaintiffs' expertise of the time it would take to transfer a single resident to a different facility, and assuming a reduction in staffing due to the closure of the Plaintiffs' eight facilities, Plaintiffs are informed and believe that it would require in excess of a month to transfer all of the residents at only one of Plaintiffs' facilities.  Furthermore, Plaintiffs are informed and believe based upon their expertise that it would take over one year to find available beds for all the residents of the eight facilities subject to this action.

56.     Numbers alone do not describe the harm that would occur by moving residents from their home and away from their families.  Families who believed their loved one would be living close by could well be required to drive hours away, across the state, or to a different state for a visit.  Residents would be far away from their homes and families and may suffer transfer trauma which could cause a decline in health or even death.

57.     Transfer trauma, a medically defined syndrome, occurs in frail and elderly people when they are forced to relocate from their home. For the 742 residents of the eight facilities subject to this action, the nursing facility is their home.

58.     Transfer trauma can cause residents to feel disoriented, lonely, confused, and sad. Residents can have physical symptoms of transfer trauma as well, including insomnia, depression, anxiety, an increased number and severity of illnesses, and an increased mortality rate.  The symptoms of transfer trauma are particularly acute in residents with dementia and/or memory deficits.

## CLAIM FOR RELIEF

### (For Preliminary and Permanent Injunctive Relief)

59.     The allegations of paragraphs 1 through 58 are re-alleged and incorporated as if fully set forth herein.

60.     CMS has the authority to revoke a Medicare provider's billing privileges pursuant to 42 C.F.R. § 424.535(a)(3) only if the provider has a current owner who was convicted of a felony offense that is detrimental to the best interests of the Medicare program.  Avi Klein relinquished his ownership and resigned his officer and director positions *before* his conviction. This act was memorialized in a Membership Interest Assignment and Assumption Agreement, as well as separate Board, Manager and Member Consents.

14

61.     When WPS issued its Revocation Letter dated August 15, 2016, Avi Klein was not an owner of any of Plaintiffs' facilities.  He had relinquished his ownership interest in the facilities a year earlier (August 15, 2015), which Plaintiffs demonstrated through substantial documentary evidence.  Consequently, WPS did not have authority to revoke the Plaintiffs' provider numbers under 42 C.F.R. § 424.535(a)(3).

62.     There are no other adequate means for Plaintiffs to attain the relief they desire and the administrative appeal process does not afford an adequate remedy at law and Plaintiffs are excused from taking further actions to attempt to do so.  The Plaintiffs' facilities will be shut down and the residents transferred out of the facilities before the Plaintiff facilities complete the administrative appeal process.

63.     <u>Irreparable Harm.</u>  If Defendants are not temporarily restrained and enjoined, Plaintiffs will go out of business imminently—even before they have a chance to complete their appeal rights before the DAB.  Patient care will be disrupted and serious physical and emotional harm is likely for hundreds of frail and elderly Medicare and Medicaid beneficiaries, absent the requested relief.

64.     <u>Plaintiffs Have No Adequate Remedy at Law.</u>  Plaintiffs have, in effect, exhausted their administrative remedies and their appeal to the place of last resort is unlikely to be scheduled even for expedited hearing until long after Plaintiffs will be out of business.  The structure and timing of the revocation and appeals process ensures that Plaintiffs will be denied any effective relief absent the requested temporary restraining order and injunctive relief.  The health risks to the residents located at Plaintiffs' facilities further demonstrate the lack of an adequate remedy.

65.     <u>Balance of Harms.</u>  The residents who will be facing the lack of opportunities for equivalent care in the communities where their families reside will still be entitled to Medicare nursing facilities services, and will still need it when relocated to other facilities.  The subject Medicare funds which Defendants have been withholding from Plaintiffs will still need to be spent for Plaintiffs' skilled nursing residents.  Defendants will not be harmed should this Court grant Plaintiffs' requested relief.

66.     The requested relief will also not adversely affect any other public interest.  The individual from whom the United States wants to protect Plaintiffs' residents, Mr. Klein, was long ago removed from Plaintiffs' operations and relinquished his ownership interests.  None of the Plaintiffs' facilities, Palmetto Health, or any of its current owners have ever been convicted of a felony.  The public interest is in no way served by unwarranted shutdowns of the Plaintiffs' facilities.

67.     The weight of the harm clearly tips to Plaintiffs and their residents while CMS cannot demonstrate any harm to the United States if a temporary restraining order and an injunction are issued.

68.     <u>Likelihood of Success on the Merits.</u>  Plaintiffs are likely to succeed on the merits.  Long standing principles of contract law clearly provides that parties to a contract may agree to an earlier effective date, regardless of when the contract was executed, and that a terminated individual's authority to act on behalf of an entity cannot be unilaterally restored through the conduct of one party.  *Mutual Life Ins. Co. v. Hurni Packaging Co.*, 263 U.S. 167, 176-76 (1923); *Josloff v. Falbourn*,  32 Del. 433, 125 A. 349, 349 (1924).

69.     Plaintiffs' Medicare and Medicaid provider agreements are valuable property rights which will be taken without due process of law, as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution.

70.     Therefore, the Court should issue a temporary restraining order and an injunction, pursuant to Rule 65 of the Federal Rules of Civil Procedure, (1) requiring Defendants to return to the status quo before termination of Plaintiffs' Medicare provider numbers and reimburse Plaintiffs for the costs they have and will incur in caring for patients eligible for Medicare pending exhaustion of their administrative remedies; and (2) enjoining CMS from issuing an order to South Carolina Medicaid to terminate further Medicaid payments.

## PRAYER

WHEREFORE, Plaintiffs respectfully request the following relief:

1.     That the Court issue a temporary restraining order and an injunction requiring the restoration of the status quo to before termination of Plaintiffs' Medicare provider numbers and reimburse Plaintiffs for the costs they have and will incur in caring for patients eligible for Medicare pending exhaustion of their administrative remedies and enjoining CMS from issuing an order to South Carolina Medicaid to terminate further Medicaid payments.

2.     Enter Judgment in Plaintiffs' favor;

3.     Award Plaintiffs costs as allowable by 28 U.S.C. § 1920, and attorneys' fees as allowable by statute, if any, including, for example, the Equal Access to Justice Act, 28 U.S.C. § 2412(d)(1)(A) based upon a finding that the Defendants' position is not substantially justified; and,

4.     That the Court issue and award Plaintiffs such other and further relief as the Court deems just and proper.

17

NELSON MULLINS RILEY & SCARBOROUGH LLP


By: s/TIMOTHY M. MCKISSOCK
    Timothy M. McKissock
    Federal Bar No. 6257
    E-mail: tim.mckissock@nelsonmullins.com
    Daniel J. Westbrook
    Federal Bar No. 5078
    E-Mail: dan.westbrook@nelsonmullins.com
    Alice V. Harris
    Federal Bar No. 6044
    E-Mail: alice.harris@nelsonmullins.com
    1320 Main Street / 17th Floor
    Post Office Box 11070 (29211-1070)
    Columbia, SC  29201
    (803) 799-2000

    *Attorneys for Plaintiffs*

February 2, 2017
Columbia, South Carolina

Application for Admission *Pro Hac Vice* To Be Filed

James Sottile IV
JONES DAY
250 Vesey Street
New York, NY 10281-1047
Tel: 212.326.3939
Fax: 212.755.7306
jsottile@jonesday.com
*Attorney for Plaintiffs*